**STATE OF WEST VIRGINIA,**
Plaintiff-Appellee,

v.

**CHAS. PFIZER & CO., Inc., et al.,**
Defendants-Appellees.

**ALPINE PHARMACY, INC., et al.,**
Plaintiffs-Appellees,

v.

**CHAS. PFIZER & CO., Inc., et al.,**
Defendants-Appellees.

Cotler Drugs, Inc., et al., Plaintiffs-
Appellants,

and

Louis Patlogan, formerly doing business
as Patlogan's Western Pharmacy,
Petitioner-Appellant.

Nos. 513–597, Dockets 35700–35784.

United States Court of Appeals,
Second Circuit.

Argued March 16, 1971.

Decided March 29, 1971.

Edward A. Berman and Harry Rubenstein, Chicago, Ill. (Lawrence Walner, Lewis W. Schlifkin and Bernard B. Brody, Chicago, Ill., on the brief), for petitioner-appellant.

Richard F. Levy, Chicago, Ill. (Levy & Erens, Chicago, Ill., Jay Erens and Howard A. Tullman, Chicago, Ill., on the brief); (Schwartz & Alschuler, Benjamin F. Schwartz and Herbert A. Karzen, Los Angeles, Cal., on the brief), for plaintiffs-appellees, Alpine Pharmacy, Inc., and others, by the Committee of Counsel.

John E. F. Wood, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chas. Pfizer & Co., Inc.; Donovan, Leisure, Newton & Irvine, New York City, for American Cyanamid Co., Cravath, Swaine & Moore, New York City, for Squibb Beech-Nut, Inc. and Olin Mathieson Chemical Corp.; Covington & Burling, Washington, D. C., for the Upjohn Co.; Winthrop, Stimson, Putnam & Roberts, New York City, attorneys for the Bristol Myers Co., on the brief), for defendant-appellees.

David I. Shapiro, New York City, for the States of Alabama, Florida, Georgia, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, North Dakota, Ohio, Oklahoma, Rhode Island, South Dakota, Texas, Vermont, Virginia, Wisconsin, the District of Columbia, and the Cities of New York and Memphis. (Harold E. Kohn and David Berger, Philadelphia, Pa., Counsel for the State of Delaware, the County of Erie, New York; the County of Summit, Ohio; the County of Allegheny, Pa.; and the Cities of Tampa, Florida, Dearborn, Detroit, Flint, Lansing, Madison Heights, and the Township of Redford, Michigan; Buffalo, New York; Akron and Cleveland, Ohio; and Pitts-

burgh, Pennsylvania. Mark I. Harrison, Phoenix, Ariz., for the State of Arizona. Robert E. Sher, Washington, D. C., Counsel for the Commonwealth of Puerto Rico. Dickstein, Shapiro & Galligan, Washington, D. C., Arthur J. Galligan, Frank F. Flegal, Washington, D. C., of counsel); and Lee A. Freeman, Chicago, Ill. (Lee A. Freeman, Jr., Jerrold E. Salzman, Chicago, Ill., on the brief), (Chauncey H. Browning, Jr., Atty. Gen. of West Virginia, Gene Hal Williams, Deputy Atty. Gen., William J. Scott, Atty. Gen. of Illinois, John P. Meyer, Sp. Asst. Atty. Gen., Theodore L. Sendak, Atty. Gen. of Indiana, Wendell C. Hamacher, Deputy Atty. Gen., Fred Speaker, Atty. Gen. of Pennsylvania, Vincent X. Yakowicz, Deputy Atty. Gen., Frank J. Kelley, Atty. Gen. of Michigan, Maxine B. Virtue, Asst. Atty. Gen., Duke W. Dunbar, Atty. Gen. of Colorado; Warren B. Rudman, Atty. Gen. of New Hampshire, William F. Cann, Deputy Atty. Gen., William O. Bradley, Sp. Asst. Atty. Gen. of Nevada, Richard L. Curry, Corp. Counsel of the City of Chicago; Charles E. Griffith, III, Director of Law of the Metropolitan Government of Nashville and Davidson County, Tennessee, Robert E. Kendrick, Deputy Director of Law), Nashville, Tenn., of counsel for the Plaintiffs-Appellees, States of West Virginia, Illinois, Indiana, Pennsylvania, Michigan, Colorado, New Hampshire, Nevada, and the Cities of Chicago and Nashville, for plaintiffs-appellees State of Alabama, and others.

George C. Mantzoros, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., John M. Desiderio, Asst. Atty. Gen., of counsel), for appellee State of New York.

M. J. Bowen, Asst. Atty. Gen. of the State of South Carolina (Daniel R. McLeod, Atty. Gen. of the State of South Carolina, of counsel), for appellee State of South Carolina.

Robert L. Woodahl, Atty. Gen. for the State of Montana (William N. Snell, Asst. Atty. Gen., of counsel), on the brief for appellee State of Montana.

Evelle J. Younger, Atty. Gen. of California, Robert E. Murphy, Deputy Atty. Gen., Robert Morgan, Atty. Gen. of North Carolina, Jean A. Benoy, Deputy Atty. Gen., Bertram T. Kanbara, Atty. Gen. of Hawaii; Lee Johnson, Atty. Gen. of Oregon, Edward A. Nugent, Chief Counsel; Kent Frizzell, Atty. Gen. of Kansas, Donald Barry, Sp. Asst. Atty. Gen., Crane Martin, Claussen & Ashworth, Topeka, Kan., Vernon B. Romney, Atty. Gen. of Washington, William H. Ferguson, Sp. Asst. Atty. Gen., Ferguson & Burdell, Seattle, Wash., on the brief for States of California, Hawaii, Kansas, North Carolina, Oregon, Utah and Washington as amicus curiae.

Robert K. Killian, Atty. Gen. of Connecticut (Norris L. O'Neill, Hartford, Conn., of counsel); George F. Kugler, Jr., Atty. Gen. of New Jersey, Elias Abelson, Asst. Atty. Gen., Francis B. Burch, Atty. Gen. of Maryland; George L. Russell, City Solicitor, Baltimore, Md., William L. Siskind, Baltimore, Md., Attorney for the State of Maryland and the Mayor and City Council of Baltimore, Maryland; James A. Maloney, Atty. Gen. of New Mexico; William C. Marchiondo, Albuquerque, N. M., Robert M. Robson, Atty. Gen. of Idaho; James E. Barrett, Atty. Gen. of Wyoming; Max P. Zall, City Atty., City and County of Denver, Colo., Leo T. Zuckerman, Denver, Colo., Granvil I. Specks, Josef D. Cooper, Perry Goldberg, Chicago, Ill., for the States of Connecticut, New Jersey, Maryland, New Mexico, Idaho, Wyoming; Mayor and City Council of Baltimore, and City and County of Denver.

Before MOORE and SMITH, Circuit Judges, and TIMBERS,* District Judge.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from an order of the United States District Court for the

* Chief Judge, United States District Court for the District of Connecticut, sitting by designation.

Southern District of New York, Inzer B. Wyatt, Judge, dated September 18, 1970 entering final judgment in favor of defendants-appellees and dismissing the actions as to them. The opinion is reported at 314 F.Supp. 710.

This case involves some 66 civil actions, 26 of which were commenced in the Southern District of New York and 40 of which were transferred to that district by the Judicial Panel on Multidistrict Litigation "for coordinated or consolidated pre-trial proceedings." The claim in each of these actions is that the defendants, who manufacture certain broad spectrum antibiotic drugs, are guilty of violations of the antitrust laws in the sale of these antibiotics, specifically sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). Treble damages were sought, as authorized in 15 U.S.C. § 15.

Before these actions proceeded to trial the defendants, on February 6, 1969 (as modified on May 9, 1969), proposed an offer of settlement in the amount of $100,000,000 as to the claims of the following groups:

(1) States, counties, cities and their political subdivisions and agencies and any other governmental entities (excluding the Federal Government) arising out of their direct purchases or out of payments to or for the benefit of recipients of welfare or other aid; and

(2) Wholesalers, retailers, and individual consumers arising out of their purchases, including claims of the states as *parens patriae* on behalf of their citizens or on behalf of classes including the state as a consumer and all other consumers in the state.

The terms of this settlement offer were as follows:

(1) The appropriate actions would be determined to be maintained as class actions pursuant to Rule 23 of the Federal Rules of Civil Procedure and the appropriate notices with option to be excluded from

the class would be directed to all class members;

(2) If the exclusions were "substantial" and "material" the defendants could withdraw the offer;

(3) The $100 million settlement figure would be reduced appropriately to reflect the exclusions from class membership;

(4) Any plaintiff accepting the settlement could present to the Court a proposed plan for the allocation of the amount received within each class;

(5) If all the plaintiffs did not agree on a common plan, then the defendants could elect to proceed with any proposed plan;

(6) The plan either agreed to or selected by the defendant would be submitted to the District Court for approval pursuant to Rule 23 (e) of the Federal Rules of Civil Procedure.

(7) The administrative and other costs of the litigation would be paid from the settlement fund; and

(8) If the settlement were approved, all claims covered within its terms would be "satisfied or otherwise terminated."

On May 26, 1969, after the settlement had been accepted in principle by nearly all the plaintiffs, the district court issued an order containing the following provisions:

(1) The several states, Puerto Rico, and the District of Columbia were designated as a "temporary national class" from which any of these plaintiffs not accepting the offer of settlement could by notice exclude themselves. As to those states accepting the offer of settlement, each action commenced by them was to be maintained as a class action as to two classes: (a) claims of states, counties, cities and their political subdivisions and agencies arising out of their purchases or out of payments to

or for the benefit of recipients of welfare or other aid; and (b) individual members of the consuming public who bought antibiotics in the state.

(2) City and county government entities which as plaintiff or intervenor plaintiff had pleaded by June 10, 1969 a class claim on behalf of consumers resident within their territorial limits could maintain a class action as proper representatives of the class.

(3) Actions commenced by wholesale drug stores which had accepted the offer of settlement were consolidated into the "consolidated wholesaler-retailer class" whose members were specified to be all purchasers of broad spectrum antibiotics who bought for "resale at wholesale or retail."

Having determined that certain actions were to be maintained as class actions, the district court pursuant to Rule 23(c) (3) in an order dated June 16, 1969 directed that notice be given to the various classes in the following manner.

(1) As to government entities and institutions, notice was to be by first class mail, the mailing list of class members to be supplied by the parties, usually the class representatives. This notice described the situation generally and included a copy of the settlement plan. The class members were given until August 1, 1969 to exclude themselves from the class.

(2) As to the consumer class members, notice was to be given by publication of the prescribed form on or about July 1, 1969 in every daily English and Spanish language newspaper of general circulation in each state. The consumer class members were given until August 1, 1969 to exclude themselves from the class, and they were also notified that if they wished to make a claim in the settlement they were required to file by August 16, 1969 a verified statement or a statement certified by their supplier. The notice to consumers also contained the following statement: "If you do not make an individual claim by August 16, 1969 that will constitute an authorization to the Attorney General [or other government official] to utilize whatever money he may recover as your representative for the benefit of the citizens of your State in such manner as the Court may direct."

(3) As to the consolidated wholesaler-retailer class, notice was to be given by first class mail, the mailing list of class members to be supplied by Clark-O'Neill, Inc., a business engaged in maintaining a mailing list of wholesale drug houses and retail drug stores in the United States. The wholesaler-retailer class members were given until August 1, 1969 to file an individual claim or to exclude themselves from the class.

Notices of exclusion were timely filed by 61 members of the classes consisting of government entities and institutions, 42 members of the classes consisting of individual purchasers, and by about 1500 members of the class consisting of wholesalers-retailers. Claims amounting to $16,500,000 were filed by 38,000 members of the class consisting of individual purchasers, and 4100 wholesalers and retailers filed claims. The face amount of the purchases made by these claimants was in excess of $345,000,000.

Thereafter, in accordance with the terms of the settlement, several plaintiffs submitted separate plans for the allocation of the $100 million settlement fund. The most detailed and comprehensive of these, the so-called "Alabama Plan," was, with some modifications, the one accepted by the defendants and approved by the court. The theory behind this plan was that the claims of the government entities were entitled to first priority, since the dollar amount of their purchases and payments could be calcu-

lated with reasonable accuracy and the damages were direct and provable. The dollar amount of these sales and payments was determined to have been $121,620,000, and it was also calculated that the prices actually charged contained an overcharge of 66⅔%. Allowing for uncertainties in law and in fact, it was concluded that for settlement purposes an overcharge figure of 40–41% could properly be used. Applying 41% to the sales figure yielded a figure of $49,864,200 or, rounded off, $50,000,000. On the same basis it was calculated that the appropriate settlement figure for reimbursement payments to welfare recipients by the government entities was $10,000,000. This left $40 million to be divided between claims of wholesalers and retailers on the one hand and individual consumers on the other.

As to the claims of the wholesalers and retailers, many of the plaintiffs were of the view that these purchasers were not entitled to any reimbursement because the members of this class sold nearly all their antibiotics to consumers on the basis of cost plus a fixed percentage profit, which resulted in their actually making higher profits as a result of the antitrust violations. However, in order to secure the agreement of the wholesaler-retailer class to the settlement, a "nuisance value" allocation of $3 million was made to the members of this class. This is one of the disputes raised in this appeal and is dealt with below.

Finally, as to the remaining $37 million allocated for individual consumers, individual claims of $16.5 million had been filed by some 38,000 persons. After these were settled, the remaining amount would be retained by the states as indicated in the public notice to be disbursed in accordance with the direction of the district court. This is the other major issue raised in this appeal and is also discussed below.

The plan then undertook to allocate the $50 million given to governmental institutions on the basis of the number of hospital beds in the institutions of, or represented by each plaintiff as a percentage of the total number of hospital beds in the country. As to the $10 million vendor reimbursement funds, allocation was made on the basis of each state's welfare payment program. The $37 million which had been allocated to the claims of individual purchasers was divided into the amount applicable to each class of consumers represented by each government entity plaintiff on the basis of the percentage of the total population represented by the population of each government entity plaintiff.

Finally, the total amount was adjusted downward to $82,615,030 to allow for those plaintiffs who had elected to exclude themselves, except that no adjustment was made for wholesaler-retailers or for the consumer class members who had elected to be excluded.

The only serious objections to this plan were raised by some members of the wholesaler-retailer class who contended that they were entitled to the entire $37 million going to consumers. After extensive negotiations, it was agreed that defendants would deposit the settlement immediately in an escrow account, and the interest on this account, amounting to more than $8 million, would accrue to the wholesaler-retailer class. Nearly all of the committee of counsel for the wholesaler-retailers accepted this arrangement. On October 20, 1969 a plan was filed in accordance with these terms for the approval of the court and the funds were deposited in the escrow account. The escrow agreement provided (in part):

(b) if there is a final order approving the proposed compromise by November 23, 1970, then on that date the escrow fund shall be divided into two separate such funds, one of $82,327,276 for classes represented by government entity plaintiffs and the other of the balance of the escrow fund for the wholesaler-retailer class;

(c) if there is no final order by November 23, 1970, then the division into two separate funds will take

place on December 23, 1970. The effect is thus to give the whole-saler-retailer class the benefit of an additional month's interest on the entire escrow fund;

In orders dated February 4 and 6, 1970 the Clerk of the Court was directed to give notice directly and by publication to all the parties in the same manner as was prescribed in the order of June 16, 1969, *supra*, as to a hearing on the proposed settlement to be held on March 24, 1970. In the meantime other minor adjustments not relevant to the issues raised on this appeal were made to the total amounts going to the various classes [see, 314 F.Supp. 732–739].

At this hearing again the only serious objections raised to the settlement plan came from some of the members of the wholesaler-retailer class to the effect that they were entitled to the entire $37 million. It should be emphasized that only a minority of this class continued to raise these objections. On June 24, 1970 Judge Wyatt filed a lengthy opinion and order approving the settlement and dismissing the actions against defendants. This appeal followed by the minority members of the wholesaler-retailer class.

The first question to be considered is what is the proper scope of review for this court to apply. Judge Wyatt viewed his responsibilities in evaluating the settlement as follows:

> Whether to approve the compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement offered is fair, reasonable, and adequate. These terms are general and cannot be measured scientifically.

> The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This

factor is sometimes referred to as the likelihood of success. The Supreme Court directs the judge to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and to "form an educated estimate of the complexity, expense, and likely duration of such litigation * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise". The Supreme Court then emphasizes: "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." The quotations are from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) [314 F.Supp. at 740–741].

It appears to be well settled that in reviewing the appropriateness of the settlement approval, the appellate court should only intervene upon a clear showing that the trial court was guilty of an abuse of discretion.[1] As Judge Brown in the Fifth Circuit recently noted in Florida Trailer and Equipment Co. v. Deal, 284 F.2d 567, 571 (1960):

> Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant estab-

---

1. Conn. Ry. and Lighting Co. v. New York, N. H. & H. R. R., 190 F.2d 305, 308 (2d Cir. 1951) ; In re Prudence Co., Inc., 98 F.2d 559 (2d Cir. 1938). (See, 3B Moore 23.80[4] ; Norman v. McKee, 290 F.Supp. 29 (N.D.Cal.1968).)

lishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and thus no basis for a compromise.

■ It is important to take particular note of the fact that in reviewing the compromise, this court need not and should not reach any dispositive conclusions on the admittedly unsettled legal issues which the case raises, yet at the same time we are apparently required to attempt to arrive at some evaluation of the points of law on which the settlement is based. A number of years ago this court set forth the applicable standard in In Re Prudence (*supra* n. 1):

> The district court did not determine the validity of the government's claim with respect to the taxability of the "commissions"; nor need this court do so. The very purpose of a compromise is to avoid the determination of sharply contested and dubious issues, as this court pointed out in the case of In re Riggi Bros. Co., 2 Cir., 42 F.2d 174, 176. Hence, to succeed upon this appeal the appellant must show, assuming there are no issues of fact in dispute, that the rules of law for which she is contending are so clearly correct that it was an abuse of discretion for the district court to approve the settlement [98 F.2d at 560].

The most interesting and difficult issue which this appeal presents is the use of the "passing-on" doctrine as regards the claims of the wholesalers and retailers, not as a defense to escape liability, as is normally the case, but rather as a basis for determining the distribution of the damages recovered among various plaintiffs. Judge Wyatt had the following comments on this question:

> Without attempting to decide the matter, it appears at first glance to be highly doubtful whether wholesalers or retailers suffered any damage whatever. Defendants sold only in dosage form; this means that the wholesaler then sold in the original packages (at a mark-up of 16⅔% or more over cost) and that—if the retail druggist did not always sell in the original packages but repackaged in varying quantities—at least the retail druggist sold the dosage form just as received from a wholesaler or from a defendant and without any addition, subtraction or combination. To the consumer, antibiotics are sold only by prescription. In some instances the retail druggist may charge his cost, plus a flat professional fee. According to affidavits of experts in the field, however, the overwhelming majority of drug stores in the period 1953–66 charged for prescription drugs a uniform mark-up of 66⅔% over cost. If so, this would mean that any overcharge by defendants in violation of the antitrust laws was passed on to the end use purchaser. The result is that wholesalers and retailers, far from sustaining damages, made substantial profits from any antitrust violations [314 F.Supp. at 745].

Although appellants dispute the factual accuracy of the court's finding that they suffered no economic loss, they also contend that even accepting this premise, they are still entitled to recovery under Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In that case United had charged Hanover more for shoe machinery equipment than would have been charged but for the violation of the antitrust laws. The cost of the machinery was one of several factors which went into the price at which Hanover sold its products to the consumer. In these circumstances, the Court relying on its prior decisions in Chattanooga Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918); and Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.

Ed. 1184 (1932) held that the passing-on *defense* was not available to United. Mr. Justice White noted:

We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. * * * Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. On the other hand, it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

\* \* \* \* \* \*

Our conclusion is that Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense. We recognize that there might be situations—for example, when an overcharged buyer has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present. 392 U.S. at 492–494, 88 S.Ct. at 2231–2232.

In considering the question of whether the obvious reluctance of the Court to allow the passing-on doctrine to be used as a defense to treble-damage liability should dictate the result in the context of the present case, the most important thing to keep in mind is the result orientation with which the Court has approached the whole area of private treble-damage litigation. A good example of this is contained in Minnesota Mining and Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S. Ct. 1473, 14 L.Ed.2d 405 (1965). There the question was whether the statute of limitations was tolled under section 5(b) of the Clayton Act by an FTC proceeding, as distinguished from an antitrust proceeding instituted by the Department of Justice. In spite of Mr. Justice Black's persuasive dissent on the legislative history of the statutes, the Court held the statute was tolled, while obliquely admitting that the result was difficult and perhaps impossible to justify in terms of conventional analysis of the text and legislative history, precisely because a "contrary conclusion" would "deprive large numbers of private litigants" of assistance in their treble damage litigation [381 U.S. at 322, 85 S. Ct. at 1479]. In Perma Life Mufflers, Inc. v. International Parts Corp., 392 U. S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Court noted that it has granted certiorari "because these rulings by the Court of Appeals seemed to threaten the effectiveness of the private action as a vital means for enforcing the antitrust policy of the United States" [392 U.S. at 136, 88 S.Ct. at 1983]. The Court in *Perma Life* then went on to substantially narrow the *pari delicto* doctrine as a defense noting:

The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of

competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. 392 U.S. at 139, 88 S.Ct. at 1984.

In *Hanover Shoe* itself Justice White placed strong emphasis on the Court's desire to encourage private treble damage actions.

These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness [392 U.S. at 494, 88 S.Ct. at 2232].

Keeping these comments in mind, there are then several obvious distinctions between the principles laid down in *Hanover Shoe* and the present case. First, the passing-on doctrine is not here being used as a defense to permit the defendants to escape liability, but rather as an attempt to award damages, insofar as is possible, to those who ultimately paid higher prices as a result of the collusive pricing, and to avoid giving a windfall gain to those who rather clearly were not injured. Secondly, to permit the use of the doctrine in the present circumstances will not act to limit or frustrate private treble-damage claims, but will, if anything, do the opposite. As Judge Feinberg noted in discussing this problem in Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 70 (S.D.N.Y. 1964):

Were the consumers a proper party in these proceedings, it might be urged

by defendants that the Court should equitably distribute the damages between the utilities and the consumers, cf. *Interstate Natural Gas Co.*, supra, but when the only parties to the suit are the equipment manufacturers and the immediate purchaser-utilities, the manufacturers should not be able to prevent the utilities from recovering from them the amount of the overcharges because the utilities have passed them on to the ultimate consumers in the form of higher rates.

Finally, the *Hanover Shoe* Court itself indicated, as quoted above, that it might well be willing to recognize, in the limited situation where the initial purchaser of the collusively priced goods resold them on a "cost-plus" basis "thus making it easy to prove that he has not been damaged * * * [that] the considerations requiring that the passing-on defense not be permitted in this case would not be present" [392 U.S. at 494, 88 S.Ct. at 2232]. The record below makes it clear that the arrangements under which the wholesalers and retailers resold these products were, in virtually all cases, cost plus a set percentage mark-up (for wholesalers 16⅔% for retailers 66⅔%). Judge Wyatt therefore concluded:

Here the antibiotics in dosage form (capsules, tablets, or other forms) were resold just as obtained from defendants. Nothing was added or changed. The mark-up was applied to the cost and the resultant price was collected from the consumer. The higher the cost, the higher the mark-up, and the higher the profit to the members of this [wholesaler-retailer] class. The situation here seems much like the " 'cost-plus' contract" referred to in the *Hanover* opinion * * * [314 F.Supp. at 746].

In regard to this point, therefore, we conclude that the district court was well within its discretion.[2]

2. See the "oil jobber" cases—Clark Oil Co. v. Phillips Petroleum Co., 148 F.2d 580 (8 Cir.), cert. denied, 326 U.S. 734, 66 S. Ct. 42, 90 L.Ed. 437 (1945); Northwest-

ern Oil Co. v. Socony Vacuum Oil Co., 138 F.2d 967 (7 Cir. 1943), cert. denied, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081 (1945); Twin Ports Oil Co. v. Pure Oil

■ The second major contention of the appellants concerns the propriety of permitting the states to recover through their attorneys general damages on behalf of individual consumers who have not themselves filed any claims. Initially the recovery by the state on behalf of consumers was based on two alternative theories, that of the state acting as *parens patriae*, and secondly, that of a standard Rule 23 class action. *Parens patriae*, literally "parent of the country," refers traditionally to the role of the state as sovereign and guardian of persons under a legal disability to act for themselves such as juveniles, the insane, or the unknown. Recently the doctrine has been used to allow the state to recover damages to quasi-sovereign interests wholly apart from recoverable injuries to individuals residing within the state. These quasi-sovereign interests have included the "health, comfort, and welfare" of the people, interstate water rights, pollution-free interstate waters, protection of the air from interstate pollutants, and the general economy of the state. [See Simburg, "State Protection of Economy and Environment," 6 Colum.J. of Law and Soc.Prob. 411 (1970).]

The use of the *parens patriae* theory has not, however, met with much success in the few attempts to apply it to the recovery of treble-damage antitrust claims, most notably in the recent ruling of the Ninth Circuit in State of Hawaii v. Standard Oil Co., 431 F.2d 1282 (1970), reversing the District Court for Hawaii which had allowed a private antitrust action to be brought by the state under this theory, although the Supreme Court has recently granted certiorari in this case, 401 U.S. 931, 91 S.Ct. 931, 28 L.Ed. 2d 215 (1971).[3] While in our view the court below might well have considered making use of a *parens patriae* theory in the present case (see, "State Protection of Its Economy and Environment" (*supra*)), Judge Wyatt made it quite clear, in spite of the assertions of appellants here, that he was proceeding solely on the basis of a Rule 23 class action, and therefore evaluation of the *parens patriae* doctrine by this court is unnecessary.

We then turn to the question of the propriety of permitting the maintenance of a class action under Rule 23. To be maintainable as a class action, a suit must meet all the requirements set forth in Rule 23(a) and also fall within one of the subsections of 23(b), in this case 23(b) (3).[4]

Co., 119 F.2d 747 (8 Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516, rehearing denied, 314 U.S. 711, 62 S.Ct. 176, 86 L.Ed. 567 (1947); Leonard v. Socony Vacuum Oil Co., 42 F.Supp. 369 (W.D.Wisc.1942), appeal dismissed, 130 F.2d 535 (7 Cir. 1942).

3. See also, Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 309 F.Supp. 1057 (E.D.Pa. 1969); Pfizer and Co., Inc. v. Clark County Hospital Ass'n, 69 Civ. 768 (S.D. N.Y.1970); North Carolina v. Chas. Pfizer and Co., 69 Civ. 839 (S.D.N.Y.1970).

4. Rule 23(a). *Prerequisites to Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Section 23(b). *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
*  *  *  *  *
(3) the court finds that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In Eisen v. Carlisle and Jacquelin, 391 F.2d 555 (2d Cir. 1968) this court had before it the question of whether a class action was proper by a single "odd-lot" purchaser of securities on behalf of himself and an estimated 3,750,000 other odd-lot traders in an action alleging violations of the Sherman Act. Judge Medina in a lengthy opinion held that a class action under these circumstances was maintainable under the provisions of revised Rule 23(b) (3), and the holding in *Eisen* would appear largely controlling in the present case. Rather clearly the requirements of Rule 23(a) have been met in that joinder of all the members would be impossible, questions of law and fact as well as claims and defenses are typical of all the members, and the representation by the state adequately protects the class members' interests.

■ Obviously the only practical way that individual consumers could recover in the circumstances of this case is through the device of class representation, and, as Judge Medina noted, "the class suit [is designed to] provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation." [391 F.2d at 560.] In addition, as Judge Medina pointed out, under both the old and new versions of Rule 23, antitrust violations involving large numbers of individuals have been held to merit treatment as class actions.[5]

The appellants also attack the adequacy of the notice given to consumers pursuant to Rule 23(c) (2). This section calls for "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." As noted above, notice to consumers was published in quarter-page, prominently headlined ads in every daily newspaper in the participating states. There are no precise rules as to what constitutes adequate notice, and the due process standards have been held to vary depending on the circumstances of each case. In the present action notice by publication was obviously the only practical alternative. The Supreme Court in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317, 70 S.Ct. 652, 658, 94 L.Ed. 865 (1949) noted: "This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning." Judge Weinstein in Dolgow v. Anderson, 43 F.R.D. 472, 497, 498 (E.D.N.Y.1968) commented on the particular notice problem involved here.

In determining what constitutes "the best notice practicable under the circumstances," it is necessary to remember that the recent amendments were specifically designed to broaden the usefulness of the class action device. * * * By overemphasizing the notice requirement that purpose may be defeated. * * * To require the [4] present plaintiffs to provide immediate actual notice to each member of the classes involved [over 200,000] would, for all practical purposes spell the immediate end to this litigation.

■ It should also be noted that the Judicial Panel on Multi-District Litigation has used Judge Wyatt's notice in the present case as the model for federal trial courts. Manual for Complex and Multidistrict Litigation, 1 Pt., 2 Moore, App. 1.65 (1970). If this type of litigation is to be entertained at all, therefore, the methods of notice used by the dis-

5. Kainz v. Anheuser-Busch Inc., 194 F.2d 737 (7 Cir.), cert. denied, 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638 (1952) ; City of Philadelphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa.1965) ; Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967) ; Philadelphia Electric Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452 (E.D.Pa.1968) ; cf. Norwalk

CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) ; Hohmann v. Packard Instrument Co., 399 F.2d 711 (7 Cir. 1968). See, Kaplan, "Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (1)," 81 Harv.L.Rev. 356 (1967).

trict court here would appear adequate to meet the due process problem.

There is one aspect of the manner in which the consumer class recovery was handled that does present some difficulty, although not mentioned by appellants, and that is allowing the states to recover on behalf of this class without requiring any affirmative indication from individual members that they wished to assign their claims in this manner. There are some cases where the courts have required class members ·to give notice that they wish to participate.[6]

■ We conclude, however, that the use of what might be termed the "Book-of-the-Month-Club" procedure in these circumstances should be permitted. The notice stated that those not filing individual claims by a certain date would be assumed to be authorizing the state through its Attorney General to recover on their behalf. Presumably there were among this group some who read the notice and made an affirmative decision to assign their claims. Undoubtedly there were also those who did not receive notice, and it is with this group we should be concerned. Since under the revised rule those in a (b) (3) class who do not elect to opt out will be bound by the judgment, it is difficult to see how those who do not receive notice but on whose behalf damages are awarded to the state are in any way harmed by permitting the use of this procedure. To require those who wish to authorize the state to recover for them to affirmatively notify the court to this effect would obviously, as a practical matter, be likely to reduce the amount of these recoveries to a minimum.

■ The other points raised by appellants appear to be clearly without merit and can be dealt with summarily. Appellants make several rather vague charges of conflict-of-interest as to various counsel for both the wholesaler-retailer class and the government plaintiffs. The

district court specifically found that "from the affidavits submitted and [from] the Court's knowledge of the progress of these actions, it is clear that the proposed compromise was the result of good faith bargaining at arms' length." The appellants have suggested nothing of substance which would cast doubt on this conclusion.

Appellants also attack the wholesaler-retailer notice of February 16, 1970 concerning the settlement conference and hearings for failure to mention the plan of allocation submitted by the Committee of Counsel for the wholesaler-retailer class. This is erroneous since the notice clearly referred to the plan and invited any interested party to inspect it at the clerk's office.

■ Appellants also complain that the wholesaler-retailer notices (of June, 1969 and February, 1970) were mailed only to wholesalers and retailers in business as of June, 1969, and therefore failed to notify druggists who went out of business prior to that time. This contention is without merit since the second notice went beyond the Clark-O'Neill trade list to include anyone whose name was available. In addition, it appears that at a later stage in these proceedings when the district court administers the intra-class distributions, individual claims will again be considered.

■ ■ Some of the appellees have suggested that the taking of this appeal was solely to obtain for the appellants the extra month's interest (some $640,000) as provided in· the escrow agreement. There is a letter dated December 18, 1969 from counsel for the minority group of wholesaler-retailers, Edward A. Berman, which suggests that this may be the case. In that letter Mr. Berman states: "Also, our group is convinced that the defendant's modified plan as accepted by most of the committee members invites and demands an appeal from the allocation order because, in our opin-

6. Philadelphia Electric Co. v. Anaconda Am. Brass Co. (*supra*, 43 F.R.D. at 459); Harris v. Jones, 41 F.R.D. 70, 71, 74–75 (D.Utah, 1966); Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391, 404 (S.D.Iowa, 1968); but see, Kronenberg v. Hotel Governor Clinton, Inc., 281 F. Supp. 622, 625 (S.D.N.Y.1968).

ion, an appeal is the only way that the final order can be delayed beyond the thirteenth month." Under the escrow agreement, this extra month's interest, which, of course, is not an insubstantial amount in this case, would otherwise have accrued to the government entity plaintiffs and the classes they represent. Sections 1912 and 1927 Title 28 of the United States Code and Rule 38 of the Federal Rules of Appellate Procedure provide that the court may award damages and double costs to the appellee in cases of frivolous and vexatious appeals. The imposition of such sanctions, however, is highly unusual and requires a clear showing of bad faith on the part of appellants. We are unable to find sufficient evidence in the record to warrant such action.

Finally we wish to commend Judge Wyatt for the skill and diligence which he has demonstrated in conducting this difficult and complex litigation.

Affirmed.