J-A26041-18

2018 PA Super 354

| | | |
|---|---|---|
| S.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.S. | : | |
| | : | |
| | : | No. 753 WDA 2018 |
| APPEAL OF: S.S., RICHARD DUCOTE, | : | |
| ESQUIRE, AND VICTORIA | : | |
| MCINTYRE, ESQUIRE | : | |

Appeal from the Order April 27, 2018
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-15-008183-10

BEFORE: BENDER, P.J.E., SHOGAN, J., and MURRAY, J.

OPINION BY MURRAY, J.: **FILED DECEMBER 24, 2018**

S.S. (Mother) appeals from the order prohibiting Mother and her attorneys from discussing the facts in this case with members of the news media, including but not limited to print and broadcast media, online or web-based communications, and inviting the public to view existing online or web-based publications. We affirm.

A prior panel of this Court summarized the relevant factual and procedural history of this case as follows:

> Child was born . . . in 2006. [S.B. (Father)] and his first wife . . . adopted Child in 2007, when he was six months old.[FN]1 [Father's first wife] died . . . when Child was two years old. Father continued his close relationship with [his first wife]'s extended family, and he raised Child, with their support, for the next four years. In May 2012, Father met Mother on an online dating website; they married four months later. Mother adopted Child in 2013.

[FN] 1 [Father's first wife] was diagnosed with breast cancer in 1999 and underwent chemotherapy. She and Father wanted to start a family, and they began the adoption process in 2003. They contacted . . . an adoption agency . . . and after going through a home study . . . and meeting the [adoption agency's] requirements, the adoption was finalized in February 2007. N.T. Trial, 5/20/16, at 176-78.

The parties' relationship was short-lived; in November 2013, Mother moved out of the main house and into the guesthouse. One year later, Mother left the marital residence and moved into her own home. The parties entered into a custody agreement on November 22, 2014.

Father filed a complaint in custody on June 11, 2015; Mother counterclaimed for primary custody. On October 9, 2015, the court held a hearing and entered an interim custody order pending a custody trial. The interim order expanded Father's custodial time. Days later, Mother filed a Petition for Abuse (PFA), on behalf of herself and Child, alleging Father had sexually abused Child, and the court ordered supervision of Father's custodial periods. Over one month later, after a five-day trial, the court dismissed the PFA petition.

On January 21, 2016, the court scheduled a custody trial to be held in April of that year; on February 2, 2016, Mother filed a second PFA petition on behalf of herself and Child, again alleging Father's sexual abuse of Child.[FN]2 Senior Judge Lee J. Mazur denied the petition without a hearing and recommended the petition be presented again before the Honorable Kim Berkeley Clark, who was presiding over the custody matter. Judge Clark denied the petition without a hearing.

[FN] 2 On February 4, 2016, Mother filed an emergency petition for special relief, indicating Child made additional disclosures of sexual abuse and that Child was refusing visits with Father. The court suspended visitation and contact between Father and Child. That same day, the court appointed Maegan Susa Filo, Guardian *ad litem* (GAL), to represent Child's best interests. On April 11, 2016, after meeting with the parties, Child, communicating with counsel for both

- 2 -

parties, reviewing expert reports, GAL made several recommendations, including the following:

Child be immediately removed from Mother's care and placed with Father after attending the Family Bridges program;

Child should be immediately reunited with [Father's first wife]'s extended family;

Child should begin attending his former synagogue;

Child should begin to attend his [] adoption group in which he participated previously with Father;

Father should be granted sole legal custody of Child;

Both Mother and Father should follow any recommendations made by Dr. McGroarty for each party's mental health therapy.

Report and Recommendation of the Guardian *ad litem*, 2/4/16, at 8.

The twenty-three day custody trial commenced on May 20, 2016, and concluded on November 18, 2016. The parties presented 24 witnesses and offered 216 exhibits, 193 of which were admitted by the court, in addition to the exhibits from the PFA trial that were incorporated into the custody trial.

On December 12, 2016, Judge Clark entered her findings of fact on the record and entered an order granting Father sole legal and sole physical custody.

*S.B. v. S.S.*, 74 WDA 2017, at *1-4 (Pa. Super. Oct. 20, 2017) (unpublished memorandum). On December 14, 2016, the trial court entered an amended custody order, but did not materially alter its award of custody in any way. Mother filed a timely appeal; this Court affirmed the trial court's order on

October 20, 2017.[1]  *Id.*  Mother filed a petition for allowance of appeal in the

Pennsylvania Supreme Court, which was denied.

> On February 1, 2018, before the [Pennsylvania] Supreme Court denied allowance of appeal, a press release [was] issued announcing an upcoming press conference regarding this case.
>
> On February 7, 2018, Mother's attorney, Richard Ducote, Esquire held a press conference concerning this case and Mother's obvious disagreement with the court's findings and orders.
>
> Although the Child is not named, Mr. Ducote identifies Mother by name and included a reproduction of the child's in-court testimony and forensic interview.
>
> The press conference, which was held on YouTube, contains a link to a DropBox folder containing pleadings from the case[,] a transcript of the Child's testimony and a copy of the Child's forensic interview at Children's Hospital Child Advocacy Clinic. Mother's name is contained within these documents.  The child's name is redacted except for the first letter of his first name[,] 'F.'
>
> On February 28, 2018, an article about the case appeared in the *Pittsburgh City Paper*.  The article began with the graphic testimony of alleged sexual abuse by Father against the Child and contained the age of the child and the name of the Child's best friend at the time the testimony was given.

Trial Court Opinion, 7/6/18, at 5 (numbered bullets omitted).

On April 27, 2018, Father presented a motion for sanctions and other

relief requesting that, based on the conduct of Mother and her attorneys, they

be "immediately enjoined from discussing this case publicly in any forum" and

---

[1] While Mother's appeal was pending before this Court, Mother filed an "Application for the Exercise of King's Bench Power or Extraordinary Jurisdiction" in the Pennsylvania Supreme Court on February 1, 2017.  Our Supreme Court denied Mother's application by per curiam order on February 24, 2017.

"that Mother and her counsel be ordered to remove all documents relating in any way to this case from public access. . . ." Motion for Sanctions and Other Relief, 4/27/18, at ¶ 34-35. That same day, the trial court held an on-the-record hearing on Father's motion. At the conclusion of the hearing, the trial court denied Father's motion for sanctions, but granted his request to prohibit Mother and her attorneys from speaking publicly about the case in any way that could cause Child to be identified, entering the following order, in relevant part:

1. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre shall NOT direct or encourage third parties to speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications.

2. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre may provide public testimony in the State House and/or Senate and in the United States Congress and Senate about parental alienation, sexual abuse of children in general or as it relates to this case. However, in providing such testimony, they shall NOT disclose any information that would identify or tend to identify the Child. [Mother] shall NOT publically state her name, the name of the Child, or [Father's] name. Attorney Ducote and Attorney McIntyre shall NOT publicly refer to the [Mother], the Child, or the [Father] by name or in any manner that would tend to identify the aforementioned parties.

3. [Mother] and Counsel shall remove information about this case, which has been publically posted by [Mother] or Counsel, including but not limited to, the press release, the press conference on the YouTube site, the DropBox and its contents, and other online information accessible to the public, **within twenty-four (24) hours.** [Mother] and Counsel shall download or place the aforementioned information onto a thumb drive, which shall be filed with this court.

> The Oral Motion to Stay This Order of Court, made on behalf of [Mother] is denied.
>
> This Order does not prohibit any party or counsel from publicly speaking or expressing an opinion about the Judge, including disclosing the entry of this Order of Court, **after** the information has been removed as set forth above. However, such expression shall NOT contain the name of the Child or other information, which would tend to identify the Child.

Findings of Fact and Order of Court, 5/1/18, at 4-5 (emphasis in original).

This timely appeal followed. Both Mother and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Mother presents a single issue for our review and consideration:

> Did the trial court legally err and abuse its discretion in granting [Father's] Motion for Sanctions and Other Relief, in part, and entering a gag order constituting a content-based restriction on speech, prohibiting [Mother], Richard Ducote, Esq., and Victoria McIntyre, Esq. from speaking publicly or communicating about this case and requiring them to remove information related to the case posted online, in violation of their rights under the First and Fourteenth Amendments to the United States Constitution and Article 1, [Section] 7 of the Pennsylvania Constitution, and without any legal or factual justification in support?

Mother's Brief at 3.

Mother contends that the gag order violates her free speech rights contained in the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. She advances a four-pronged attack on the court's order, asserting that the order: (1) represents an impermissible prior restraint on protected speech; (2) represents an unlawful content-based restriction on protected speech; (3) imposes an impermissible

blanket prohibition on any remark regarding the case without demonstrating how it advances a compelling governmental interest; and (4) imposes an unconstitutionally vague and overbroad restriction on free speech.

The trial court concluded that an order prohibiting Mother and her attorneys from speaking or communicating publicly about this case was necessary to protect Child's privacy and shield him from "harmful public scrutiny." Trial Court Opinion, 7/6/18, at 3-4. In issuing its order, the trial court considered whether the conduct and speech of Mother and her attorneys: (1) tended to identify Child; (2) was harmful to Child; and (3) whether Child's right "to be free from undue scrutiny, ridicule, and scorn" outweighed the right of Mother and her attorneys to engage in public discourse. *Id.* at 4. Specifically, the trial court noted that Child attends a school "where teachers, parents and students are likely to know each other and that the identification of a parent would naturally identify the child." *Id.* at 6. The trial court found that any disclosure and release of Mother's or Father's name in the media could result in the identification of Child, and thus, the trial court concluded that good cause existed to restrict the speech of Mother and her attorneys. *Id.*

Mother's claim implicates a fundamental right: the free exercise of speech as guaranteed by the First Amendment to the Constitution of the United States and Article I, Section 7 of the Pennsylvania Constitution. We first set forth our scope and standard of review, noting that the United States Supreme Court has stated that in reviewing First Amendment cases, appellate

courts must conduct a review of the entire record. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *In re Condemnation by Urban Redevelopment Auth. Of Pittsburgh*, 913 A.2d 178, 183 (Pa. 2006). As the claim presented involves a pure question of law, our scope of review is plenary and our standard of review is *de novo*. *Id.*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment's protection is made applicable to the states through the Fourteenth Amendment. *Id.*

> When the government restricts expression due to the content of the message being conveyed, such restrictions are allowable only if they pass the strict scrutiny test. That test is an onerous one, and demands that the government show that the restrictions are "(1) narrowly tailored to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002).
>
> Yet, strict scrutiny is not applied simply because a plaintiff raises a claim that its freedom of expression has been curtailed. The High Court has recognized that where the governmental regulation applies a content-neutral regulation to expressive conduct, strict scrutiny is an inappropriate test to apply. *Texas v. Johnson*, 491 U.S. 397 (1989). The test which is applied to such content-neutral regulations was first enunciated in the seminal case of *United States v. O'Brien*, 391 U.S. 367 (1968). In *O'Brien*, the defendant was convicted of violating a statute which criminalized the act of destroying or mutilating a draft card. The defendant had burned his Selective Service registration certificate in order to convince people to adopt his anti-war beliefs. The defendant argued that the conviction could not stand as the statute criminalizing the destruction of draft cards ran afoul of the First Amendment.
>
> In analyzing this claim, the *O'Brien* Court stated that where expressive and nonexpressive conduct are combined in the same

activity, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376. The *O'Brien* Court decreed that such "government regulation is sufficiently justified" if:

1) Promulgation of the regulation is within the constitutional power of the government;

2) The regulation furthers an important or substantial governmental interest;

3) The governmental interest is unrelated to the suppression of free expression; and

4) The incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest.

*Id.* at 377. The *O'Brien* Court found that all four prongs were met and thus denied the defendant relief.

*In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d at 183–84 (parallel citations omitted); *see also Clark v. Community for Creative Non–Violence*, 468 U.S. 288 (1984) (observing that content-neutral restrictions on speech are only valid if they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a significant governmental interest unrelated to speech, and leave open ample alternative channels for communication of the information).

"The principle inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The controlling factor in the determination is the government's

purpose in enacting the restriction. *Id.* A purpose that has no relation to the content of the speech is deemed neutral, even if the restriction affects some speakers or messages and not others. *See id.*; *see also* 122 A.L.R. 5th 593, at Section 2 ("A regulation is content neutral when it may be justified without reference to the content of the regulated speech.").

Instantly, our careful review of the gag order reveals that the order's proscription is limited to "any information that would identify or tend to identify the Child." Findings of Fact and Order of Court, 5/1/18, at 5. As written, therefore, the order is not concerned with the **content** of Mother and her attorneys' speech, but instead, with the **target** of the speech, namely, Child, a juvenile whose identity and privacy the court seeks to protect. It is the identification of Child that triggers the application of the gag order. Accordingly, we reject Mother's claim that the order is a content-based restriction on speech and conclude, rather, that the order is content-neutral.

We also find that the order is narrowly tailored to serve a significant governmental interest. "Broadly speaking, the state, acting pursuant to its *parens patriae* power, has a compelling interest in safeguarding children from various kinds of physical and emotional harm and promoting their wellbeing."[2] *D.P. v. G.J.P.*, 146 A.3d 204 (Pa. 2016) (citing *Hiller v. Fausey*, 904 A.2d 875, 886 (Pa. 2006) ("The compelling state interest at issue in this case is the

---

[2] "*Parens patriae*, literally 'parent of the country,' refers . . . to the role of the state as sovereign and guardian of persons under a legal disability to act for themselves such as juveniles, the insane, or the unknown." *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1089 (2d Cir. 1971).

state's longstanding interest in protecting the health and emotional welfare of children.")).  Thus, "[t]he power of the parent, even when linked to a free exercise claim, may be subject to limitation  . . .  if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens."  ***Shepp v. Shepp***, 906 A.2d 1165, 1173 (Pa. 2006) (citing ***Wisconsin v. Yoder***, 406 U.S. 205, 233–34 (1972)).  "The state's compelling interest to protect a child in any given case, however, is not triggered unless a court finds that a parent's speech is causing or will cause harm to a child's welfare."  ***Id.***

Here, our review of the entire voluminous record reveals that this case implicates grave issues, not the least of which is Mother's unsubstantiated but unwavering allegation of sex abuse by Father, which warrants confidentiality of the proceedings.  Child has suffered emotional trauma because of the strife between the parents.  ***See generally*** Trial Court Opinion & Findings of Fact, 1/31/17; N.T., 5/20/16; N.T., 5/26/16; N.T., 8/26/16; N.T., 9/2/16; N.T., 10/6/16; N.T., 11/18/16.  The perpetuation and magnification of that strife in the media – particularly the internet – would exacerbate the harm to Child and constitute an egregious invasion of Child's privacy.   The aim of the gag order is, as noted, to promote the best interests of Child by protecting his privacy and concealing his identity.  The government's interest in preventing further emotional harm to Child is substantial.

Likewise, we find that the order leaves ample alternative channels for Mother and her attorneys to provide public testimony pertaining to the

sensitive issues in this case. The gag order does not prevent Mother and her attorneys from speaking publicly about child abuse and parental alienation generally. The order merely limits Mother and her attorneys from publishing or communicating anything that would tend to identify and harm Child. Additionally, the order does not bar the media from any of the proceedings in the case, nor does it prohibit the media from reporting on the matter. Whether any members of the media have deemed the matter newsworthy is not clear from the record. However, we note that a gag order on parties and their attorneys has been cited as an accepted less restrictive alternative to restrictions imposed directly on the media. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 564 (1976).

Lastly, we conclude that Mother has failed to establish that the order is unconstitutionally vague or broad. Mother claims that the gag order "represents a total restraint upon speech of any kind." Mother's Brief at 22. Mother asserts that the gag order "muzzles [Mother's] voices [sic] from not only the nationwide problem of family courts failing to protect sexually abused children in custody cases, but also from discussing the details of this case in light of other relevant important discourse." *Id.* at 25. Mother suggests that the gag order "acts to chill others" in similar positions "for fear of similar constitutional and financial harms." *Id.*

To the contrary, we find that the order is clear and narrowly tailored. As noted above, the order states:

4. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre shall NOT direct or encourage third parties to speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications.

5. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre may provide public testimony in the State House and/or Senate and in the United States Congress and Senate about parental alienation, sexual abuse of children in general or as it relates to this case. However, in providing such testimony, **they shall NOT disclose any information that would identify or tend to identify the Child.** [Mother] shall NOT publically state her name, the name of the Child, or [Father's] name. Attorney Ducote and Attorney McIntyre shall NOT publicly refer to the [Mother], the Child, or the [Father] by name or in any manner that would tend to identify the aforementioned parties.

* * *

Findings of Fact and Order of Court, 5/1/18, at 4-5 (emphasis added).

An unconstitutionally vague law is one that fails to give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden by law and encourages arbitrary and erratic arrests and convictions. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Here, we are confident that a person of ordinary intelligence would read the order to forbid exactly what Mother wanted to do: take her case to the media. The proscription in the order is limited to a specific, small group of persons intimately involved in one case and makes clear precisely what Mother and her attorneys are prohibited from discussing, *i.e.*, anything that might identify and harm Child. Accordingly, Mother's assertion that the order is unconstitutionally vague and overbroad lacks merit.

- 13 -

Viewing the gag order in light of the above-referenced intermediate test applicable to content-neutral, governmental restrictions on speech, we determine that the order is constitutionally permissible. The order is narrowly-tailored to advance a substantial government interest at stake, *i.e.*, safeguarding children from various kinds of physical and emotional harm and promoting their wellbeing, while remaining open to other channels of communication available to Mother and her attorneys. Accordingly, we reject Mother's constitutional challenge to the gag order in this case.[3]

Order affirmed.

_____

[3] We further remind Attorney Ducote and Attorney McIntyre of their ethical obligations under the Pennsylvania Rules of Professional Conduct and note that all violators of the Rules are subject to the possibility of disciplinary action. An attorney is an officer of the court, who agrees to abide by certain ethical rules before being permitted to practice law. As the Preamble to the Pennsylvania Rules of Professional Conduct provides, "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having a special responsibility for the quality of justice." As a part of this "special responsibility," an attorney must comport him or herself in a manner that ensures fairness and justice to all parties to litigation, and may include some degree of restraint in revealing the details of a case to the general public. **See also** Pa. Rule of Professional Conduct 8.4(c) ("It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/24/2018