**[J-29-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| S.B. | : | No. 39 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Superior Court entered December |
| | : | 24, 2018 at No. 753 WDA 2018, |
| | : | affirming the Order of the Court of |
| S.S. | : | Common Pleas of Allegheny County |
| | : | entered April 27, 2018 at No. FD-15- |
| | : | 008183-10. |
| APPEAL OF: S.S., RICHARD DUCOTE, | : | |
| ESQUIRE, AND VICTORIA MCINTYRE, | : | ARGUED:  May 27, 2020 |
| ESQUIRE | : | |

## OPINION

**JUSTICE BAER**                                    **DECIDED:  DECEMBER 22, 2020**

In this appeal, we examine an order entered in a custody matter that places restrictions on the speech of a parent and her counsel to determine whether the order violates the right to free speech as guaranteed by the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.  Finding that the order restricted only the manner of speech and not the content, the Superior Court upheld the order, concluding that the restriction of speech furthered the important governmental interest of protecting the psychological well-being and the privacy of the child at the center of the custody dispute.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

*I. Background*

At the heart of this case is a protracted and contentious battle between S.B. ("Father") and S.S. ("Mother") over the custody of their son, F.B.H. ("Child"), who was born in 2006.[1] In 2007, Father adopted Child with his first wife, who died in 2008, when Child was two years old. For the next four years, Father raised Child on his own, with continued support from his first wife's extended family.

In September of 2012, Father married Mother, who adopted Child in 2013. The marital union was short-lived, as later that year, Mother and Father separated and entered into a custody agreement.[2] In June of 2015, Father filed an action seeking custody of Child, and Mother later counterclaimed for primary custody. Following a hearing on October 9, 2015, an interim custody order was entered, which expanded Father's custody time. Five days later, Mother filed a protection from abuse ("PFA") petition on behalf of herself and Child, alleging that Father had sexually abused Child. Accordingly, the trial court entered a temporary PFA order, limiting Father's contact with Child.

The trial court subsequently conducted a five-day trial to address the claims set forth in the PFA petition. Discrediting the allegations of sexual abuse, the trial court dismissed Mother's PFA petition, vacated the temporary PFA order, and granted Father supervised partial custody. On February 2, 2016, a few weeks after the trial court scheduled a custody trial for later that year, Mother filed a second PFA petition, again alleging Father's sexual abuse of Child. The trial court subsequently denied the second PFA petition.

---

[1] In an effort to protect Child's identity, we set forth only those facts necessary to resolve this appeal.

[2] The precise details of the custody agreement are not relevant to this appeal.

On May 20, 2016, the trial court commenced the custody trial, which spanned over twenty-three days, and ultimately concluded on November 18, 2016. At trial, the parties presented twenty-four witnesses, including Mother, Father, Child, and Child's Guardian *ad litem*, and the trial court also admitted nearly two hundred exhibits. On December 12, 2016, the trial court entered an order, which the court amended on December 14, 2016, granting Father sole legal and physical custody of Child.[3] The orders also directed Father and Child to participate in the Family Bridges Workshop for Troubled and Alienated Parent-Child Relationships, and ordered Mother not to have any contact or partial custody with Child for a period of ninety days.

In an opinion dated December 22, 2016, the trial court explained its ruling and set forth detailed findings of fact. Relevant here, the trial court concluded that Father did not sexually abuse Child. The court reached this conclusion after evaluating Child's testimony in open court; reviewing videos of forensic interviews in which Child made detailed allegations of purported sexual abuse; reading Child's testimony in the PFA proceeding, which had been introduced into the record of the custody trial; listening to the testimony of experts who evaluated Father; and considering the testimony of witnesses who had observed the nature of the relationships between both Father and Child and Mother and Child, before and after the allegations were made. The trial court explained that the details of Child's in-court descriptions of the alleged sexual abuse were not credible and that the timing of the allegations were suspect, *i.e.*, they arose shortly after Father's partial custody time had been expanded.

To be precise, the trial court did not believe that Child deliberately lied. Rather, the court reasoned that Child may have believed that abuse occurred years earlier, but

---

[3] At the time the trial court entered its final custody order, it had been almost one year since Father was able to have contact with Child. *See* Trial Court Opinion, 1/30/2017, at 6.

Child's testimony contained statements that were "simply not true and which [were] contradicted by other credible evidence." Trial Court Opinion, 12/22/2016, at 7. The trial court further relied upon expert testimony, establishing that Father "is a low risk to perpetrate physical, psychological, emotional, or sexual abuse." *Id.* at 8. Finally, the trial court concluded that Mother had isolated Child from everything he knew before she adopted him, and alienated Child from Father, as well as Child's extended family. *Id.* at 53, 55.

The Superior Court affirmed the trial court's custody order in a memorandum opinion filed on October 20, 2017, holding that the record supported the trial court's findings that Mother alienated Child from Father, and that Father did not sexually abuse Child. Mother filed a petition for allowance of appeal in this Court, which we denied on February 22, 2018. *S.B. v. S.S.,* 182 A.3d 430 (Pa. 2018).

Meanwhile, on February 7, 2018, a few weeks prior to this Court's denial of allocatur in the custody matter, Mother's attorney Richard Ducote, Esquire, held a press conference on the online video-sharing platform, YOUTube, expressing Mother's fervent disagreement with the trial court's findings and orders in the custody matter. Mother has described the press conference as a means to draw "attention to child sexual abuse victims everywhere and the role of the courts in granting custody of children to their identified abusers." Brief for Appellant at 5. According to Mother, "[a]dvocates and parents from various organizations around the country gathered at the press conference to shed light upon and to educate the public about the ways that family courts nationwide have been failing child abuse victims, as well as to highlight pending legislation in the United States House of Representatives and the Pennsylvania legislature." *Id.* at 5-6.

While Child was not named during the press conference, Attorney Ducote identified Mother by name and, notably, included a link providing access to a reproduction

of Child's in-court testimony and forensic interview, during which Child sets forth detailed allegations of Father's sexual abuse, which the trial court had deemed unfounded. Mother's name is included in these documents, while Child's name is redacted and replaced by the first letter of his first name. However, Child obviously could have been identified by virtue of the disclosure of Mother's identity.

Further, on February 28, 2018, an article about the custody matter appeared in the *Pittsburgh City Paper*, quoting the identical intimate and detailed account of Child's sexual abuse allegations that were highlighted in Mother's press conference. *See* Rebecca Addison, *Children's advocates say family courts unfairly favor father, even when they're the abusers*, PITTSBURGH CITY PAPER (February 28, 2018). Although the article did not state the name of Child, Mother, or Father, it referenced Child's age, the first name of Child's best friend, and the fact that Attorney Ducote had represented the mother in the custody matter. The article asserted that the Pennsylvania Legislature was considering a bill to require additional training for court personnel in child custody cases to prevent courts from granting custody of children to fathers who abused them.

On April 19, 2018, Father filed a motion for sanctions and other relief in the trial court, seeking an order prohibiting Mother and her counsel (Richard Ducote, Esquire, and Victoria McIntyre, Esquire) from speaking publically about the case in any forum, directing them to remove any information about the case that they had posted publically or disseminated, and imposing monetary sanctions.

By order dated April 27, 2018, the trial court denied Father's motion for sanctions because there had been no court orders preventing the parties from speaking publically about the custody matter at that time, and the record had not been sealed.[4] The trial court's order, however, granted in part Father's motion for other relief, stating:

---

[4] The trial court record in this case remains unsealed.

It is hereby ORDERED that [Mother]; Richard Ducote, Esquire; and Victoria McIntyre, Esquire shall NOT speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications. The following is also ORDERED.

1. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre shall NOT direct or encourage third parties to speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications.

2. [Mother]; Richard Ducote, Esquire; and Virginia McIntyre may provide public testimony in the State House and/or Senate and in the United States Congress and Senate about parent alienation, sexual abuse of children in general or as it relates to this case. However, in providing such testimony, they shall NOT disclose any information that would identify or tend to identify the Child. [Mother] shall NOT publically state her name, the name of the Child or [Father's] name. Attorney Ducote and Attorney McIntyre shall NOT publically refer to [Mother], the Child, or [Father] by name or in any manner that would tend to identify the aforementioned parties.

3. [Mother] and Counsel shall remove information about this case, which has been publically posted by [Mother] or Counsel, including but not limited to, the press release, the press conference on the YouTube site, the Drop Box and its contents, and other online information accessible to the public, **within twenty-four (24) hours.** [Mother] and Counsel shall download or place the aforementioned information onto a thumb drive, which shall be filed with this court.

The Oral Motion to Stay This Order of Court, made [on] behalf of [Mother] is **DENIED**.

This Order does not prohibit any party or counsel from publicly speaking or expressing an opinion about the Judge, including disclosing the entry of this Order of Court, **after** the information has been removed as set forth, above. However, such expression shall NOT contain the name of the Child or other information, which would tend to identify the Child.

Trial Court Order, 4/27/18, at 1-2 (hereinafter "gag order") (emphasis in original).

On the same day, the trial court issued extensive findings of fact in support of its order. Therein, the trial court found that because Child attended a small private school where both faculty, students, and parents were likely to know each other, the release of Mother's full name in the media identifies Child as the young boy who provided the graphic testimony about the alleged sexual abuse. Findings of Fact, 4/27/2018, at ¶ ¶12-14. The trial court found that "the disclosure of the identity of [Child] in this case is harmful and clearly not in his best interest as there is clearly the potential for curious parents, teachers and students in his school to read this information, which could subject him to undue scrutiny, ridicule and scorn." *Id.* at 15.

While the trial court indicated a willingness to support the transparency of court proceedings and the constitutional right to free speech, it recognized "the harm that thoughtless, vexatious, and vengeful speech can cause a young child caught in the middle of a high-conflict custody battle." *Id.* at 17. Under the circumstances presented, the trial court opined that the right of Child to be free from "undue scrutiny, ridicule, or scorn, outweighs the rights of Mother and her attorney to engage in thoughtless, toxic, misleading and vengeful discourse about this case."[5] *Id.* at 18. Mother and her counsel ("Appellants") filed a notice of appeal.

In their statement of matters complained of on appeal, Appellants contended that the trial court abused its discretion by entering the gag order, which they alleged constituted both a content-based speech restriction and a prior restraint on the content of speech that prohibited them from speaking publicly or communicating about the case in violation of their right to free speech under the United States and Pennsylvania

---

[5] The trial court additionally found that the actions of Attorney Ducote "bordered on professional misconduct." *Id.*

Constitutions.[6] The trial court strongly disagreed with Appellants' categorization of the gag order as content-based. Trial Court Opinion, 7/6/2018, at 3. Finding no case law directly on point, the trial court examined jurisprudence relating to the sealing of open records and the closure of court proceedings. The court acknowledged that while courts are presumptively open, the Juvenile Act recognizes the need to shield children from harmful public scrutiny in delinquency and dependency matters. *Id.*, at 3-4 (citing 42 Pa.C.S. § 6336(d) (providing that "the general public shall be excluded from hearings under [Chapter 63 of the Juvenile Act]") and 42 Pa.C.S. § 6308 (providing for limited public access to records relating to juvenile proceedings)).

The trial court further cited divorce hearings as another type of proceeding which courts may close to protect rights of parties upon a showing of good cause. *Id.* at 4 (citing Pa.R.C.P. 223(4) (permitting the court to enforce rules and orders to exclude the public or persons not interested in the proceedings when the court deems such exclusion to be in the interest of the public good, order or morals)).

In deciding to restrict Appellants' speech, the court indicated that it considered whether Appellants' conduct and speech tended to identify Child; whether their conduct and speech was harmful to Child; and whether Child's right to be free from undue scrutiny, ridicule and scorn outweighed Appellants' right to "engage in thoughtless, toxic, misleading, and vengeful discourse about this case." *Id.* Based on its specific findings

---

[6] The First Amendment to the United States Constitution, entitled, "Religious and political freedom," provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

Article I, Section 7 of the Pennsylvania Constitution, entitled "Freedom of press and speech; libels," provides, in relevant part, that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . ." PA. CONST. art. I, §7.

of fact of April 27, 2018, set forth *supra,* the trial court found good cause to restrict Appellants' speech.

The Superior Court affirmed, finding that the gag order was constitutionally permissible. *S.B. v. S.S.*, 201 A.3d 774 (Pa. Super. 2018). Initially, the court recognized that Appellants' claim implicated the fundamental right to the free exercise of speech as guaranteed by the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. The court observed that when the government restricts expression due to the content of the message being conveyed, the restrictions are permitted only if they pass the strict scrutiny standard, which requires the government to demonstrate that the restrictions are narrowly tailored to serve a compelling state interest. *S.B. v. S.S.*, 201 A.3d at 781 (citing *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002)).

The Superior Court reasoned, however, that where the government applies a content-neutral regulation to expressive conduct, the intermediate scrutiny standard set forth in *U.S. v. O'Brien*, 391 U.S. 367 (1968), applies, which justifies the regulation if: "(1) promulgation of the regulation is within the constitutional power of the government; (2) the regulation furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest." *S.B. v. S.S.*, 201 A.3d at 781 (citing *O'Brien*, 391 U.S. at 377). The Superior Court observed that the "princip[al] inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Interpreting the gag order's proscription as limited to any information that would identify or tend to identify Child, the Superior Court found that the gag order was content-neutral. *Id.* at 782. The court reasoned that the gag order "is not concerned with the **content** of Mother and her attorneys' speech, but instead, with the **target** of the speech, namely, Child, a juvenile whose identity and privacy the court seeks to protect." *Id.* (emphasis in original). The court further reasoned that the "power of the parent, even when linked to a free exercise clause claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* (citing *Shepp v. Shepp*, 906 A.2d 1165, 1173 (Pa. 2006) (internal citation omitted)).[7]

Reiterating the trial court's findings that the allegations of sexual abuse by Father were unsubstantiated and that Child suffered emotional trauma from the "strife between the parents," the Superior Court concluded that the "perpetration and magnification of that strife in the media . . . . would exacerbate the harm to Child and constitute an egregious invasion of Child's privacy." *Id.* In the Superior Court's view, the aim of the gag order was "to promote the best interests of Child by protecting his privacy and concealing his identity," while permitting ample alternative channels for Mother and her attorneys to

---

[7] As noted *infra*, *Shepp* involved a constitutional challenge to a custody order prohibiting a father of Mormon faith from teaching his minor child about polygamy, which is a crime in Pennsylvania. The case highlighted the tension arising between the First Amendment right to free exercise of religion and the Commonwealth's declaration of policy set forth in 23 Pa.C.S. § 5301 (repealed), to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and a sharing of the rights and responsibilities of child-rearing by both parents when in the best interest of the child. This Court held that a court may prohibit a parent from advocating religious beliefs, which, if acted upon, would constitute a crime if it is established that the parent's conduct "would jeopardize the physical or mental health or safety of the child, or have a potential for significant social burdens." *Shepp*, 906 A.2d at 1174.

provide public testimony relating to the broader issues implicated by the custody matter. *Id.*

Finally, the Superior Court rejected Mother's contention that the gag order's terms were unconstitutionally vague or overly broad, finding instead that the order is "clear and narrowly tailored." *Id.* at 783. The court opined that "a person of ordinary intelligence would read the order to forbid exactly what Mother wanted to do: take her case to the media." *Id.* The Superior Court found that the gag order's limited restriction made clear that Mother and her counsel may not discuss anything that will harm Child. *Id.* Accordingly, the Superior Court stated, "Viewing the gag order in light of the above-referenced intermediate test applicable to content-neutral, governmental restrictions on speech, we determine that the order is constitutionally permissible." *Id.* The court further concluded that the order is "narrowly-tailored to advance a substantial government interest at stake, *i.e.*, safeguarding children from various kinds of physical and emotional harm and promoting their well-being, while remaining open to other channels of communication available to Mother and her attorneys."[8] *Id.* at 784.

We granted allocatur in this case to address the following issue:

> In a child custody case, did the Pennsylvania Superior Court err in affirming the gag order in violation of [Appellants'] rights under the First and Fourteenth Amendments to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution when the order precluded the parent and attorneys from speaking publicly about the case in a manner that would identify the child involved?

*S.B. v. S.S.*, 217 A.3d 806 (Pa. 2019).

*II. The Parties' Arguments*

---

[8] The Superior Court further reminded Attorney Ducote and Attorney MacIntyre of their ethical obligations under the Pennsylvania Rules of Professional Conduct. *Id.* at n.3.

Appellants contend that the Superior Court's affirmance of the gag order violates their constitutional rights to free speech as the order constitutes "freewheeling censorship" that prohibits them indefinitely from speaking about the case in any manner, while imposing no restrictions on Father's speech. Brief for Appellants at 9. Categorizing the gag order as both a content-based restriction and a prior restraint on speech, Appellants posit that the heightened constitutional standard of strict scrutiny must apply. They maintain that because there is no compelling state interest supporting the imposition of an indefinite and total restraint upon their speech, the gag order cannot stand.[9]

Relating to the claim that the gag order constitutes a content-based restriction on speech, Appellants' position begins with the premise that content-based restrictions require the government to satisfy the strict scrutiny standard to pass constitutional muster. Brief for Appellant at 10 (citing *Turner Broad. Sys. Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (internal citation omitted) (holding that "[o]ur precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content")). They contend that the gag order's plain language constitutes a total prohibition against speaking publicly about the custody case in any manner, not only in a manner that identifies Child, as held by the Superior Court.

In support of this contention, Appellants rely exclusively upon the following sentence in the order: "It is hereby ORDERED that [Mother]; Richard Ducote, Esquire; and Victoria McIntyre, Esquire shall NOT speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications." Trial Court Order, 4/27/2018, at 1. Ignoring the remaining text of the gag order, Appellants

---

[9] Appellants make no distinctions in their arguments relating to the restriction of speech of a parent in a custody proceeding, as opposed to restriction of the speech of an attorney representing a parent in that matter.

view the speech restriction as constituting a total ban on speech of a particular topic, *i.e.*, Child's custody proceeding, which, they argue, renders the regulation of speech content-based.

Concerning the prior restraint claim, Appellants assert that the gag order falls under this category as it restricts their speech prior to them uttering it, thereby rendering the gag order presumptively unconstitutional under both our state and federal charters. Recognizing that prior restraints on speech are not unconstitutional *per se*, Appellants observe that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," and that a prior restraint bears a heavy presumption against its constitutional validity, which cannot be overcome here. Brief for Appellants at 10 (citing *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559 (1976)). Appellants assert that the Superior Court's opinion in this case fails to discuss their claim that the gag order constitutes a prior restraint on the content of their speech. Brief for Appellant at 17.

Rather than setting forth a compelling state interest to support a prior restraint on speech or a content-based restriction on speech, Appellants contend that the lower courts "provided irrelevant and spurious 'justifications' for the gag order which are devoid of any legal significance." Brief for Appellants at 18. They acknowledge that this Court in *Shepp, supra,* observed that the Commonwealth may, in limited circumstances, infringe upon a parent's right to free speech to avoid harm to a child's welfare. Appellants submit, however, that a restriction on speech cannot occur "unless a court finds that a parent's speech is causing or will cause harm to a child's welfare." Brief for Appellant at 19. They contend that the lower courts cited no evidence that the restricted future speech would result in real harm or danger to Child. Appellants posit that a finding of harm to Child's welfare here, based upon a generalized theory that children may be harmed by the

disclosure of negative personal information during custody litigation, would abrogate parents' First Amendment protections in all custody proceedings. Further, they assert that if Child's interests were truly compromised by public speech about the custody matter, the gag order would have prohibited speech by all parties with knowledge of the case, not only the speech of Mother and her counsel.[10]

Discounting that harm would befall Child and similar children in custody matters if public speech were not, in certain circumstances, restrained, Appellants submit that federal courts have chosen to "sacrifice" First Amendment values in criminal cases where the regulated speech affected the fairness of the trial or threatened the administration of justice by influencing a jury, and not in child custody proceedings, which have no jury to taint. Brief for Appellants at 20-21. Similarly, they argue, the trial court's reliance upon children's privacy interests at risk in delinquency and dependency proceedings have little, if anything, to contribute to the First Amendment issues at play here. Appellants further assert, with little elaboration, that other state courts which have addressed gag orders in custody proceedings have found them to be unconstitutional. *Id.* at 21 n.54.

Appellants additionally argue that the gag order's terms are vague and overly broad, as it is difficult to ascertain what speech is precluded and the prohibitions restrict more speech than is necessary under the circumstances. In support of their argument, Appellants cite language in the gag order prohibiting them from "encouraging" third parties to speak publicly or communicate about this case, as well as language precluding them from speaking publicly or communicating in any manner that would "tend to" identify Child.

---

[10] While Appellants observe that the gag order restricts their speech and not Father's speech, they forward no claim that this fact alone invalidates the order. The essence of the trial court's ruling was that it was necessary to impose the gag order on Mother and her counsel, as they were the only trial participants taking the case to the media to the detriment of Child. This case does not involve a scenario where there was a danger of both parents disclosing intimate facts that would harm the psychological well-being and privacy interests of the child and the court restrained only the speech of one parent.

In their view, there is no clear standard by which to judge whether one's actions violate these vague mandates. Most egregiously, Appellants submit, the gag order prohibits them from publicly stating Mother's name when testifying before legislative bodies about parental alienation or sexual abuse of children in general, or as it relates to this case. They further assert that because there is no temporal limit on the speech restriction, the gag order silences their speech relating to Child's custody proceedings well beyond Child's eighteenth birthday.

In addition to their First Amendment challenge, Appellants also claim that the gag order violates Article I, Section 7, of the Pennsylvania Constitution because the Commonwealth's charter affords broader protection than the First Amendment. Brief for Appellants at 11-12 (citing *Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002) (explaining that Article I, Section 7 of the Pennsylvania Constitution provides additional protections than its federal counterpart as "it guarantees not only freedom of speech and the press, but specifically affirms the 'invaluable right' to the 'free communication of thoughts and opinions,' and the right of 'every citizen' to 'speak freely' on 'any subject' so long as that liberty is not abused")).

Finally, Appellants contend that there are significant public policy considerations that mandate this Court's reversal of the gag order. *See* Brief for Appellants at 35-36, 37 (asserting that "the gag order muzzles Appellants' voices from not only the nationwide problem of family courts failing to protect sexually abused children in custody cases, but also from discussing the details of this case in light of other relevant important discourse;" and that upholding the gag order "sends a message . . . that others in a comparable position should err on the side of silence when considering speaking out, for fear of similar constitutional and financial harms").

In response, Father contends that the Superior Court did not err in affirming the trial court's carefully-tailored restriction of Appellants' speech, after concluding that the speech was harmful and dangerous to Child's psychological and emotional well-being. Initially, he highlights the factual findings made by the trial court in both the underlying custody matter, which are not at issue herein, and in the present gag order litigation, which he contends are supported by the record. Father reminds this Court that the trial court's custody decision was based upon the finding that it was not Father, but Mother who posed a danger to Child.

Father emphasizes that Mother's allegations that he sexually abused Child arose soon after an order was entered increasing his custody time with Child, and that Mother subsequently alienated Child from Father and the rest of Child's family. Brief for Appellee at 2 n.3 (citing *S.B. v. S.S.*, 74 WDA 2017 (Pa. Super. 2017), at 11-12 (stating, "The core of this custody case is not allegations of sexual abuse; it is isolation and alienation. Child's vulnerability and susceptibility to Mother's influence . . . is not lost on this Court. Our review of the record indicates that Mother has systematically engineered an isolation plan, at Child's psychological expense.")). He further reiterates that Appellants placed the story with the news media by holding an online press conference that provided access to select graphic and misleading materials, such as Child's testimony and forensic interview regarding the allegations of sexual abuse by Father, which had been deemed unfounded.[11]

---

[11] Acknowledging Child's specific allegations of sexual abuse against him, Father explains that Child's sexual descriptions "were delivered cheerfully by rote without suggestion of trauma, resembled not actual sex acts but a child's imagination thereof, were highly inconsistent and evolved and escalated precisely in tandem with Mother's litigation needs, [and] were delivered only after many months of isolation by Mother from all who loved [Child]." Brief for Appellee at 3 n.4. Father further asserts that Child's allegations of sexual abuse "were accompanied in evidence by an audiotape of [Child] weeping privately to Mother that he could not remember the abuse Mother insisted he had

As to the pertinent legal analysis, Father adopts the reasoning of the lower courts in this matter. While not disputing Appellants' primary contention regarding the deference afforded to the constitutionally protected right to free speech, Father takes the position that no rights, not even fundamental ones, are unconditional. Contrary to Appellants' contention that their right to free speech may not be limited at all under the circumstances presented, Father posits that the trial court acted within constitutional boundaries when imposing the narrow restrictions on Appellants' speech based upon the detailed findings of fact establishing that the challenged speech in the custody matter would expose Child to undue ridicule, scorn, and scrutiny.

In Father's view, the speech restriction focuses upon Child as the target of the speech, as opposed to the content of Appellants' message. Thus, he concludes, the restriction on speech need not be subject to the highest constitutional standard of strict scrutiny and, instead, is constitutional as it furthers the important governmental interest of safeguarding the well-being and privacy of Child, who is caught in the midst of a contentious custody proceeding.

Finally, Father submits that the gag order's terms are not vague or overly broad. He maintains that the order clearly provides that Appellants can speak publicly about the issues of parental alienation or child sexual abuse, either generally or as those topics relate to this case specifically, but may not do so in a manner that identifies Child. Similarly, Father contends, the gag order permits Appellants to express opinions about the trial court judge and the entry of the custody order in this case, so long as those expressions do not disclose Child's identity. Thus, he concludes, a person of ordinary intelligence would know that the gag order restrains only speech that identifies Child and

---

endured, and Mother's assurance that he would eventually remember it if he continued to describe it." *Id.*

subjects Child to psychological harm. Accordingly, Father urges this Court to affirm the Superior Court's judgment that upheld the constitutionality of the trial court's gag order.

*III. Analysis*

As Appellants challenge the gag order on the ground that it violates the right to free speech as guaranteed by the state and federal constitutions, their appeal presents questions of law for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Davis*, 220 A.3d 534, 540 (Pa. 2019). In conducting our inquiry, we acknowledge that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038 (1991) (internal citation omitted).

Appellants' claim clearly implicates the fundamental right to the free exercise of speech as guaranteed by the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. We first examine Appellants' challenge under the United States Constitution. Ratified in 1791, the First Amendment provides, in relevant part, that Congress shall make no law "abridging the freedom of speech." U.S. CONST. AMEND. I; *Barr v. Am. Ass'n of Political Consultants*, 140 S.Ct. 2335, 2346 (2020). The First Amendment's free-speech clause is made applicable to the states through the Fourteenth Amendment. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

It is beyond cavil that our political and cultural lives rest upon the principle, guaranteed by the First Amendment, "that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. at 641. Accordingly, the First Amendment precludes the

government from restricting expression due to its message, ideas, subject matter, or content. *Police Dept. of Chicago v. Mosely*, 408 U.S. 92, 95 (1972). One's constitutional right to free speech, however, while fundamental, is not absolute. *Neb. Press Ass'n*, 427 U.S. at 570. Freedom of speech "does not comprehend the right to speak on any subject at any time." *American Communications Assn. v. Douds*, 339 U.S. 382, 394 (1950). Instead, First Amendment freedoms must be "applied in light of the special characteristics of the [relevant] environment." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969).

Keeping in mind these general principles, we first consider the nature of the restriction placed on Appellants' speech.

*A. Nature of Speech Restriction*

It is well-established that content-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.*

Determining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor. *Turner Broad. Sys.*, 512 U.S. at 642. A restriction is content based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying. *Reed*, 576 U.S. at 163-64. *See e.g.*, *Barr*, *supra* (holding that a federal statute permitting only those robocalls that relate to the collection of government debt is clearly a content-based restriction on speech because the law favors speech made for collecting government debt over political and other speech).

To the contrary, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys.*, 512 U.S. at 642 (internal citation omitted). A content-neutral regulation of speech passes constitutional muster if it satisfies the following four-part standard set forth by the High Court in *United States v. O'Brien, supra*: (1) the regulation was promulgated within the constitutional power of government; (2) the regulation furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. at 377.

So long as the regulation of speech is not a means, subtle or otherwise, of exercising content preference, it is not presumed invalid. *See Turner Broad. Sys., supra* (deeming the challenged statute content neutral because the face of the statute distinguishes between speakers in the television programming market based only on the manner in which the programmers transmit their messages to viewers, not the content of the messages they carry, and the purpose for which the statute was enacted is also unrelated to content).

Restrictions on the time, place and manner of expression, whether oral, written or symbolized by conduct, are a form of a content-neutral regulation of speech. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 (1984). These restrictions may make it more difficult for an individual to engage in a desired speech-related activity by targeting, *inter alia*, the means of speech or the method of communication, but they do not target the content of the message ultimately conveyed. Time, place, and manner restrictions are valid, provided that they: (1) are justified without reference to the content

of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest unrelated to speech;[12] and (3) leave open ample alternative channels for communication of the information. *Id.*

The High Court has explained that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791 (internal citation omitted). The government's purpose of the speech restriction is the controlling consideration and, if the purpose is unrelated to the expression of content, the restriction is deemed neutral, even though the speech restriction may have an incidental effect on some speakers or messages, but not others. *Id.*

While the precise text of the two constitutional standards differ (*i.e.*, the *O'Brien* standard employed to determine whether a regulation of speech is content neutral and the specific standard applicable to time, place, and manner restrictions on speech), the High Court has clarified that the *O'Brien* standard "is little, if any, different from the standard applied to time, place, or manner restrictions." *Community for Creative Non-Violence*, 468 U.S. at 298.

Viewing the gag order in accord with this federal jurisprudence, we conclude that, when read in its entirety, the order constitutes a content-neutral restriction on the manner by which Appellants may convey their public speech, which was imposed for the exclusive

---

[12] The United States Supreme Court has clarified that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. at 798.

purpose of protecting the psychological well-being and privacy of Child, and was not intended to, and, indeed, does not restrict Appellants' message.[13]

In this regard, we respectfully reject Appellants' contention that the gag order constitutes a total ban on all speech relating to the topic of Child's custody proceeding, as we find such contention unsupported by the order's plain text and its clearly articulated purpose. To illustrate, the gag order begins with language providing that Appellants shall not "speak publicly or communicate about this case." Trial Court Order, 4/27/18, at 1. It further provides for two additional restrictions: (1) providing that Appellants shall not "direct or encourage third parties to speak publicly or communicate about this case;" and (2) requiring Appellants to remove within twenty-four hours information publicly posted about this case. Id. at 1-2.

Germane to this appeal, the gag order includes additional provisions expressly permitting public speech relating to Child's custody proceeding if conveyed in a particular manner. The gag order states that Appellants may "provide public testimony in the State House and/or Senate and in the United States Congress and Senate about parent alienation, sexual abuse of children in general or as it relates to this case," so long as their speech is not conveyed in a manner that would identify Child, such as publicly stating Mother's name, or publicly referring to either parent or Child. Id. Finally, the gag order clarifies what speech is not proscribed. It states that the order "does not prohibit any party

_____

[13] Respectfully, contrary to Justice Wecht's dissenting opinion, which focuses primarily upon that portion of the gag order precluding Appellants from "speak[ing] publicly or communicat[ing] about" the custody matter, our constitutional analysis is based upon consideration of the gag order in its entirety. As demonstrated throughout, the language of the gag order is nuanced uniquely and tailored to circumvent a specific manner of public speech that was found, based upon an extensive factual record, to cause imminent harm to Child, and does not discriminate based upon the content of the message conveyed. For this reason, the out-of-state cases cited by the dissenting opinion are wholly distinguishable as they involve gag orders that contain proscriptions distinct from those at issue in this appeal and circumstances unlike those presented herein.

or counsel from publicly speaking or expressing an opinion about the Judge, including disclosing the entry of this Order of Court," after the enumerated posted information has been removed and as long as Child's identity is not disclosed by the communication. *Id.* at 2.

A careful review of this language reveals that, contrary to Appellants' assertions, the gag order in no way silences them from expressing all of their views on important issues relating to the custody proceeding. Indeed, while the gag order precludes Appellants from speaking publicly about "this case," when read in context, the order affords Appellants ample opportunity to disseminate all of their thoughts into the marketplace of ideas without restriction on the content of their message. The gag order further allows Appellants to voice all of their opinions regarding issues important to them, including parental alienation, child sexual abuse, and placement of children in the custody of sexually abusive parents, and to testify about these issues before governmental bodies in an effort to remedy these vital societal concerns. The only limitation on Appellants' speech lies in the manner of communication, as they are precluded from conveying such public speech in a way that exposes Child's identity and subjects him to harm. Thus, the order does not deny Appellants the opportunity to be the catalyst for social or political change. *See Meyer v. Grant*, 486 U.S. 414, 421 (1988) (internal citation omitted) (observing that the "First Amendment was fashioned to assure unfettered exchange of ideas for the bringing about of political and social changes desired by the people").

The gag order also does not discriminate against speech relating to the trial court's actual entry of the gag order itself or speech criticizing the trial court's judgment in issuing that order. As noted, once Appellants remove from the public domain the enumerated information found to be harmful to Child, they are free to criticize the trial court's decision, assuming they do so in a manner that does not disclose Child's identity. Hence, the gag

order places no restraint on Appellants' message regarding the governmental actions that were taken in connection with Child's custody case. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966) (observing that "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that amendment was to protect the free discussion of governmental affairs").

Under these circumstances, we hold that the gag order is content neutral, as the restrictions therein were not motivated by hostility toward Appellants' message and targeted only the method of communication for the exclusive purpose of protecting the psychological well-being and privacy of Child. Accordingly, the heightened constitutional standard of strict scrutiny is inapplicable. Instead, we proceed to apply the intermediate standard of constitutional scrutiny set forth in *United States v. O'Brien, supra*, as well as the similar federal precedent applicable to restrictions placed on the time, place, and manner of speech.

### B. O'Brien Factors

### 1. Constitutional Power of Government

The first *O'Brien* factor involves a determination of whether the regulation of speech was promulgated within the constitutional power of government. This factor requires little discussion and has scant import here as no party contends that, aside from its effect on free speech rights, protecting the interests of a child subject to a custody determination is beyond the constitutional power of the judiciary. This first factor, is, thus, clearly satisfied.

### 2. Furtherance of an Important or Substantial Governmental Interest

The second *O'Brien* factor requires that the speech restriction further an important or substantial governmental interest. In this appeal, determining the degree of importance of the governmental interest asserted requires the balancing of Appellants' interest in

unfettered expression of free speech against Child's interest in psychological and emotional well-being and privacy. We observe that strikingly absent from Appellants' fervent efforts to safeguard their fundamental right to free speech is any acknowledgment that the cost of exercising that right is the curtailment of Child's right to freedom from lasting psychological and emotional trauma in derogation of his overall best interests.

For the reasons set forth *infra*, we find that the trial court correctly concluded that the justifications for the speech restrictions contained in the gag order are, without question, important and substantial, and that Child's right to psychological and emotional well-being and privacy outweigh Mother and Counsel's right to free speech. *See Seattle Times v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (providing that while litigants do not surrender their First Amendment rights at the door of the courthouse, those rights may be subordinated to other rights or interests that arise during trial).

As a general matter, it is well-settled that protecting a minor from psychological and physical harm serves an important governmental interest, in fact, in many circumstances, a compelling state interest. *See Sable Communications of Cal*, 492 U.S. 115, 126 (1989) (acknowledging that "there is a compelling interest in protecting the physical and psychological well-being of minors"); *D.P. v. G.J.P.*, 146 A.3d 204, 211 (Pa. 2016) (providing that "[b]roadly speaking, the state, acting pursuant to its *parens patriae* power, has a compelling interest in safeguarding children from various kinds of physical and emotion harm and promoting their well[-]being"); *Hiller v. Faust*, 904 A.2d 875, 886 (Pa. 2006) (providing that "the compelling state interest at issue in this case is the state's longstanding interest in protecting the health and emotional welfare of children").

This sentiment was expressed in our decision in *Shepp v. Shepp*, *supra*, which involved the constitutionality of a custody order prohibiting a father of Mormon faith from teaching his minor daughter about polygamy, which is a crime in Pennsylvania. Although

not styled as a free speech claim, the case involved the tension arising between the First Amendment right to free exercise of religion and the Commonwealth's declaration of policy set forth in 23 Pa.C.S. § 5301 (repealed), to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and a sharing of the rights and responsibilities of child-rearing by both parents when in the best interests of the child.

Upon a review of jurisprudence relevant to a claim of free exercise of religion, this Court in *Shepp* held that a court may prohibit a parent from advocating religious beliefs, which, if acted upon, would constitute a crime, if it is established that the parent's conduct "would jeopardize the physical or mental health or safety of the child, or have a potential for significant social burdens." *Shepp*, 906 A.2d at 1174. We clarified that the "state's compelling interest to protect a child in any given case, however, is not triggered unless a court finds that a parent's speech is causing or will cause harm to a child's welfare." *Id.* at 1173.

In fact, Appellants concede that this Court observed in *Shepp* that the Commonwealth may, in limited circumstances, infringe upon a parent's right to free speech to avoid harm to a child's welfare. *See* Brief for Appellant at 19. They contend, however, that there was no demonstration of harm to Child resulting from their speech, and posit that the trial court "provided irrelevant and spurious 'justifications' for the gag order which are devoid of any legal significance." *Id.* at 18. Respectfully, we disagree completely, as the trial court's findings of harm to Child resulting from Appellant's speech were articulate, specific, and supported by the record.

In this most unusual custody case, where the hearing spanned over twenty-three days and the parties presented twenty-four witnesses and nearly two hundred exhibits, a review of the finding of harm should be considered in the context of the custody

proceeding in its entirety. Upon hearing all the evidence and evaluating the credibility of every witness, the trial court concluded that the allegations that Child was sexually abused by Father were unfounded, and that it was Mother's actions in alienating Child from Father and his extended family that caused Child substantial harm, and not the actions of Father.[14]

The impetus for issuance of the gag order was Appellants' online press conference, which contained a link to pleadings from the custody case, a transcript of Child's testimony, and a copy of Child's forensic interview, setting forth, in Child's own words, detailed allegations of sexual abuse by Father, which the trial court had found did not occur. While Child's name was not mentioned in the press conference, Mother's identity was disclosed, thereby allowing those in the community to ascertain easily the identity of Child. A few weeks later, although not identifying Child, a local paper quoted the same detailed account of Child's sexual assault allegation that had appeared in the press conference.

The sensitive nature of the information disclosed during Appellants' press conference is troubling as it reveals Child's description of what he mistakenly thought may have occurred in terms of sexual abuse by Father. The online public posting allowing the community and the world to view Child's own words regarding his most intimate thoughts and fears of parental sexual abuse would undoubtedly leave an indelible mark on an

---

[14] As noted, in the prior proceeding the Superior Court affirmed the order granting custody of Child to Father, holding that the record supported the trial court's finding that Mother alienated Child from Father, and that Father did not sexually abuse Child. This Court subsequently denied allocatur. Thus, we summarily reject Appellants' attempt to challenge in this appeal the finding that Father did not sexually abuse Child.

innocent twelve-year-old boy, as will the entire protracted and contentious custody battle.[15]

The trial court made specific factual findings, explaining that Appellants' quest to take the custody case to the media was particularly harmful to Child and not in his best interests because when parents, students and teachers in Child's small private school read the graphic account, it will subject Child to "undue scrutiny, ridicule, and scorn." Trial Court Opinion, 7/6/2018, at 6. While appreciating Appellants' competing First Amendment rights, the trial court recognized "the harm that thoughtless, vexatious, and vengeful speech can cause a young child caught in the middle of a high-conflict custody battle." *Id.* We concur in the trial court's assessment in this regard.

As these facts demonstrate, it would be inappropriate for this Court to conclude that Appellants' First Amendment rights render a trial court in a custody proceeding powerless to safeguard a child from threatened psychological harm stemming from the manner by which a parent delivers his or her speech. Otherwise, an innocent child in a custody proceeding could be become a public spectacle during the very judicial process that is intended to promote the child's best interests. The First Amendment does not require such a result.

Accordingly, to balance the important interests at stake, we hold that a restriction on the manner of parental speech in a custody case furthers an important governmental interest where there is a substantial likelihood that the restrained speech has harmed or will imminently harm the child. Finding that such justification has been satisfied here, we conclude that the second *O'Brien* factor has been clearly established.

*3. Governmental Interest Unrelated to Suppression of Free Expression*

---

[15] The record establishes that Child was born in 2006 and the online press conference was conducted in 2018. Thus, Child would have been about twelve years of age at the time.

We have already concluded that the justification of the gag order, to protect the psychological well-being and privacy of Child, is unrelated to the suppression of the content of Appellants' expression, thereby satisfying the third prong of the *O'Brien* standard.

*4. Incidental Restriction is No Greater Than Essential*

In legal parlance, this fourth prong of the *O'Brien* test (*i.e.*, that the incidental restriction on speech is no greater than is essential to the furtherance of that interest) is identified more readily by the nomenclature employed in jurisprudence discussing time, place, and manner restrictions, *i.e.*, requiring the restriction on speech to be "narrowly tailored" to serve the articulated governmental interest. *Ward*, 491 U.S. at 798.[16] Appellants contend that the gag order is not narrowly tailored, but contains overly broad terms that prohibit all speech on the topic of the Child custody proceeding.

We have already examined at length Appellants' contention in this regard, and have concluded that it is unsupported by the text and articulated purpose of the gag order. As discussed extensively throughout, although the gag order contains the restriction directing Appellants not to speak publicly about "this case," when read in context the order affords Appellants ample opportunity to disseminate their thoughts into the marketplace of ideas without restriction on the content of their message, to voice their opinions regarding issues important to them, including the societal concerns involved in this custody case and the propriety of the trial court's rulings, and to testify about these concerns before governmental bodies, as long as Appellants do so in a manner that protects Child's identity.

---

[16] As noted, the High Court has clarified that while a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests, the government need not employ "the least restrictive or least intrusive means of doing so." *Id.*

Appellants, however, offer an additional ground upon which to base a finding that the language of the order is too broad. They emphasize that the order prohibits Appellants from publicly stating Mother's name when testifying before legislative bodies about topics such as parental alienation or sexual abuse. While at first blush it may seem severe to preclude Mother from stating her name when publicly speaking about societal issues that arose in the case, the simple fact remains that public release of the identity of Mother discloses the identity of Child, undermining the essence of what the trial court was seeking to accomplish; protection of Child's psychological and emotion well-being and his privacy.

As further evidence that the gag order was narrowly crafted, we observe that the order applied only to Mother and her counsel. The trial court did not seal the record of the custody trial nor impose any prior restraints upon the press that precluded the dissemination of information relating to the custody trial. The United States Supreme Court has observed that limiting the speech of trial participants is a less restrictive alternative than imposing a prior restraint on the press itself. *See e.g. Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966) (outlining less restrictive measures than imposing prior restraints on the press, including the proscription of extrajudicial statements by the parties, their counsel, witnesses, and court officials); *Nebraska Press Ass'n,* 427 U.S. at 564 (same).

Rather, the trial court took the precise action that would prevent Mother and her counsel from taking their case to the media - restricting their public speech about the custody proceeding that would identify and harm Child. As discussed at length herein, the trial court went to great lengths to narrow such restriction by leaving open ample alternatives for communication of the information Appellants wanted to express, restricting only the manner by which that speech could be conveyed, *i.e.*, refraining from

identifying Child while disseminating their message. Accordingly, we conclude that the speech restrictions contained in the gag order were narrowly tailored to further the important government interest of protecting Child.

## *C. Vagueness Challenge*

We next address Appellants' claim that the gag order is vague because the restrictions on speech contained therein are unclear, rendering it difficult to ascertain what conduct is prohibited. First, Appellants challenge language in the order precluding them from speaking before legislative bodies in a manner that would "tend" to identify Child. Second, they posit that the language providing that they may not "encourage" third parties to speak or communicate publicly about the case is vague, as it is capable of multiple interpretations. Finally, Appellants maintain that the duration of the gag order is unclear as it sets forth no expiration date.

An unconstitutionally vague law is one that fails to give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden by law. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Restraints on speech must include "some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1888 (2018). So long as the law "gives adequate warning of what activities it proscribes" and sets forth "explicit standards" for those individuals who must apply it, the law is not unconstitutionally vague. *Broadrick v. Okla.*, 413 U.S. 601, 607 (1973) (citation omitted). While it is inevitable that words contain "germs of uncertainty" and that disputes may arise over the meaning of particular terms, a law shall not be invalidated on vagueness grounds if its terms are set forth in a manner "that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Id.* at 608.

Applying this jurisprudence to the language of the gag order, we conclude that the language is not unconstitutionally vague as it clearly informs Appellants that they may not speak publicly about the custody matter in a manner that will disclose Child's identity. Appellants' specific assertions to the contrary are unpersuasive. First, we decline to engage in a pedantic dissection of the word "tend" as used in the language of the gag order precluding Appellants from speaking publicly about the custody case in a manner that would "tend" to identify Child. As noted throughout, the trial court made clear that it was precluding only speech about the custody case communicated in manner that would identify Child.

Similarly, the preclusion against "direct[ing] or encourage[ing]" others to communicate or speak publicly about the case is clear when read in the context of other language in the order directing Appellants to remove the extensive information already posted online, which Appellants had encouraged others to view. Finally, while the gag order admittedly does not include a duration for the speech restrictions, it is undeniable that the trial court imposed the order to protect a child's interests; thus, such preclusion would continue only during the child's minority. We advise trial courts, however, to utilize precise terms of duration when drafting orders imposing restrictions on the manner of speech under circumstances where the duration of the prohibition is unclear, as such an omission could form the basis for a successful vagueness challenge.

Accordingly, we agree with the Superior Court's conclusion that a person of ordinary intelligence would read the gag order to forbid Appellants from taking this peculiar custody case to the media in a way that would harm the psychological and emotional well-being of Child. Thus, we decline to afford Appellants' relief on their vagueness challenge.

*D. Article I, Section 7 of the Pennsylvania Constitution*

Because we need to effectuate fully the protections contained in the state charter, we proceed to examine Appellants' claim that, even assuming that the gag order satisfies the requisites of the federal constitution, it violates Article I, Section 7 of the Pennsylvania Constitution. *See Commonwealth v. Edmunds*, 586 A.2d 887, 894 (Pa. 1991) (holding that "we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions").

We acknowledge that Article I, Section 7 is an ancestor and not a stepchild of the First Amendment, and that the protections that it guarantees are firmly rooted in Pennsylvania history and experience. *Commonwealth v. Tate*, 432 A.2d 1382, 1388 (Pa. 1981). We additionally observe that in certain circumstances this Court has afforded greater protection under Article I, Section 7, than guaranteed by its federal counterpart. *See Pap's A.M., supra* (holding that a public decency ordinance that made it a summary offense to appear nude in public violates the freedom of expression provision of Article I, Section 7 of the Pennsylvania Constitution, notwithstanding that the ordinance does not violate the First Amendment).

However, Appellants have offered no meaningful argument or authority, and this Court has found none, suggesting that Article I, Section 7 requires the application of a heightened constitutional standard to a content-neutral restriction on a parent's free speech rights, as exercised during a custody proceeding where the trial court has made a specific finding that the speech harms the child's right to psychological and emotional well-being and privacy. As Appellants have failed to persuade us to the contrary, we conclude that the protections afforded by the First Amendment and Article I, Section 7 are coextensive as it relates to the particular circumstances presented by this appeal.

Accordingly, for the reasons set forth in our discussion of the First Amendment in which we examined the gag order's content-neutral restrictions pursuant to the

intermediate constitutional standard and balanced the competing interests of Appellants and Child, we respectfully find no merit to Appellants' contention under our state charter.

## E. Conclusion

In summary, we reject Appellants' contentions that the gag order issued in the custody proceeding constitutes a content-based speech restriction or a prior restraint on the content of their speech. Instead, we hold that the gag order restricts only the manner of Appellants' speech and not the content. Because the speech restrictions are justified by the important governmental interest of protecting the psychological and emotional well-being of Child and the Child's privacy, and are narrowly tailored to serve that articulated governmental interest, they do not violate the First Amendment to the United States Constitution. We further conclude that the gag order is not unconstitutionally vague. Finally, we hold that the gag order does not violate Article I, Section 7 of the Pennsylvania Constitution. Thus, we affirm the judgment of the Superior Court, which upheld the constitutionality of the gag order.

Chief Justice Saylor and Justices Todd, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Dougherty joins.

Justice Wecht files a dissenting opinion in which Justice Donohue joins.